## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | |
|---|---|
| AMERICAN HOME HEALTHCARE<br>SERVICES, INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 4:17-cv-00089-TWP-DML<br>) |
| FLOYD MEMORIAL HOSPITAL AND<br>HEALTH SERVICES a/k/a THE HEALTH AND<br>HOSPITAL CORPORATION OF FLOYD<br>COUNTY, and BAPTIST HEALTHCARE<br>SYSTEM, INC., | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |
| FLOYD MEMORIAL HOSPITAL AND<br>HEALTH SERVICES, | )<br>)<br>) |
| Counter Claimant, | )<br>)<br>) |
| v. | )<br>)<br>) |
| AMERICAN HOME HEALTHCARE<br>SERVICES, INC., | )<br>)<br>) |
| Counter Defendant. | )<br>) |

## ENTRY ON MOTION FOR JUDGMENT ON THE PLEADINGS
## AND MOTION TO DISMISS COUNTERCLAIM

This matter is before the Court on a Motion for Judgment on the Pleadings filed by

Defendant/Counter Claimant Floyd Memorial Hospital and Health Services a/k/a The Health and

Hospital Corporation of Floyd County, and Baptist Healthcare System, Inc. ("Floyd Hospital")

and Floyd Memorial Hospital and Health Services ("Floyd Home Health") (collectively,

"Defendants"). (Filing No. 30.) Also before the Court is Plaintiff/Counterclaim Defendant

American Home Healthcare Services, Inc's. ("American") Motion to Dismiss Floyd Hospital's

counterclaims. (Filing No. 38.) American initiated this anti-trust litigation alleging that Floyd Hospital has attempted to monopolize home healthcare referrals of patients discharged from its hospital and interfered with American's patient relationships regarding the patients' selection of a home healthcare agency. Floyd Hospital alleges counterclaims against American for tortious interference with existing contracts and business relationships as well as defamation. For the following reasons, the Court **denies** Floyd Hospital's Motion for Judgment on the Pleadings, and **grants in part and denies in part** American's Motion to Dismiss.

## I.    BACKGROUND

Floyd Hospital is an acute care, public hospital located in New Albany, Indiana. (Filing No. 31 at 3.)[1] Floyd Hospital owns Floyd Home Health, which is a licensed home healthcare agency. *Id.* American is also a licensed provider of home healthcare services, and its principal office is located in Jeffersonville, Indiana. (Filing No. 1 at 2.) Many patients require and receive outpatient home healthcare services upon discharge from hospitals. (Filing No. 41 at 2.) At the time of the patients' discharge from the hospital, discharge planners (employed by the hospital) make the arrangements for the patients to receive home healthcare services. *Id.* When home healthcare services are deemed necessary, Medicare regulations require the hospital to provide the patient with a list of home healthcare agencies that are Medicare-eligible, available, and that serve the geographic area in which the patient resides. 42 C.F.R. § 482.43 (c). Home healthcare agencies "must request to be listed by the hospital as available." *Id.* As part of the discharge planning process, the hospital may not specify or limit the qualified providers that are available to the patient and must inform the patient of their freedom to choose among participating Medicare providers. 42 C.F.R. § 482.43 (c)(7).

---

[1] Floyd Hospital was acquired in October 2016, and is now known as Baptist Health Floyd. (Filing No. 31 at 3.) For consistency and clarity, the Court will refer to this hospital as Floyd Hospital.

Although American concedes that it is listed on a pamphlet of available home health agencies furnished by Floyd Hospital to its patients, it alleges that Floyd Hospital has installed mechanisms into the discharge planning process which increase the likelihood that Floyd Home Health will receive the most patient referrals. (Filing No. 31-1; Filing No. 41 at 7.) Specifically, American alleges that physicians (who make home healthcare referrals) must go through an extra step to select any home health provider besides Floyd Home Health due to the fact that the only two choices on the computer drop-down menu have been "Floyd" and "other". (Filing No. 41 at 7.) If a patient wanted to use the "other" category, the physician would have to go through an extra step to write down specifically which agency the patient chose. *Id.* Floyd and American operate in six identical counties (Floyd, Clark, Harrison, Scott, Washington, and Crawford) with American serving an additional three counties (Jefferson, Jackson, and Orange) (Filing No. 31-1).

Floyd Hospital has capacity for 243 beds. (Filing No. 31 at 8.) American alleges that Floyd Hospital is the dominant short-term acute care hospital facility in Southern Indiana (Floyd County), while Floyd Hospital alleges that Floyd County is part of the Greater Louisville metropolitan area, which is served by many acute care hospitals. (*Id.*; Filing No. 41 at 3.) There are factual disputes as to whether the relevant geographic hospital market is Southern Indiana or the Greater Louisville metropolitan area; however, for purposes of the pleadings stage, it is undisputed that Floyd Hospital's acute care hospital competitors (within Southern Indiana) are Clark Memorial Hospital and Kentuckiana Medical Center—both located in Clark County, Indiana. (Filing No. 41 at 3.) Additionally, American alleges that in 2015, Floyd Hospital had more than double the patient revenue of Clark Memorial Hospital and more than eight times the revenue of Kentuckiana Medical Center. *Id.*

Medicare home healthcare patient referrals result in higher reimbursement rates (and profits) to providers than Medicaid home healthcare patients. *Id.* at 4. In 2015, Floyd Memorial received home healthcare payments from Medicare totaling $10,874,908.00 on total charges of $11,658,920.00. *Id.* American's Complaint alleges that in 2015, "no less than 64% of the Medicare patients discharged from Floyd Memorial Hospital to a home health agency were referred in-network to Floyd Home Health", while the remaining 30.2% of referrals were spread among six other home health agencies. (Filing No. 1 at 7.) American also alleges upon information and belief, total self-referrals for Floyd Home Health constitute no less than 70% of the total referral base currently. *Id.* In 2015, American received 11 referrals (1.3%) of Medicare patients from Floyd Hospital which included a less desirable mix of patients (from a financial standpoint) that resided far away, and/or Medicaid patients. (Filing No. 41 at 6.)

The Centers for Medicare & Medicaid Services ("CMS") publishes quality ratings by assigning stars to home healthcare agencies.[2] According to the site, American earns a rating of 3-stars and Floyd Home Health earns a rating of 4 ½-stars; however, American alleges that there is little to no positive correlation between star ratings and the proportion of referrals received. *Id.* (Filing No. 41 at 6.)

American alleges that based on several specific eyewitness reports from patients and their family, Floyd Hospital denied patient choice by referring patients to Floyd Home Health without offering any choices, advocating exclusively for Floyd Home Health, and/or assigning patients to Floyd Home Health despite the patient's choice to use American's services. *Id.* at 6-7. Based on the foregoing, American claims that Defendants have been, and continue to be, in a positon to starve the competition to a point at which competition will cease and Defendants will hold a

---

[2] *Home Health Compare*, MEDICARE.GOV https://www.medicare.gov/homehealthcompare/seasrch.html (last visited February 21, 2018).

monopoly with respect to supplying the relevant product in the relevant geographic market. *Id.* at 8. American has asserted claims for attempted monopolization under Section 2 of the Sherman Act, as well as state law claims for tortious interference with existing and business relationships with patients. *Id.*

On August 19, 2016, before filing suit, Dr. Abdul Buridi ("Dr. Buridi") sent an email to Floyd Hospital employed physicians, which took issue with Floyd Hospital's referral process and implicitly warned that the physicians could be held responsible for violation of Stark and antitrust laws. (*See* [Filing No. 29-1](#).) The email also stated that Dr. Buridi's purpose in writing was to see if the issue could be resolved amicably before American's attorneys filed a lawsuit in federal court. *Id.* at 2. Floyd Hospital's counterclaim is based on this email and it asserts state law claims for defamation, and tortious interference with existing and business relationships.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Bielanski v. County of Kane*, 550 F.3d at 633 (7th Cir. 2008). However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual

allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.; see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the parties have filed the complaint and answer. Rule 12(c) motions are reviewed under the same standard as a motion to dismiss under 12(b)(6). *Frey v. Bank One*, 91 F.3d 45, 46 (7th Cir. 1996). Like a Rule 12(b)(6) motion, the court will grant a Rule 12(c) motion only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (*quoting Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)). The facts in the complaint are viewed in light most favorable to the non-moving party; however, the court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Id.* (*quoting R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)). "As the title of the rule implies, Rule 12(c) permits a judgment based on the pleadings alone. . . . The pleadings include the complaint, the answer, and any written instruments attached as exhibits." *Id.* (internal citations omitted).

### III.    DISCUSSION

#### A.    Judicial Notice

As an initial matter, the Court declines to take judicial notice of the website information that Floyd Hospital has injected into the pleadings. "A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Ennenga v. Starns,* 677 F.3d 766, 773–74 (7th Cir. 2012) (citation omitted). While websites such as the Indiana State Department of Health and Centers for Medicare & Medicaid Services are sources whose accuracy cannot be questioned, the data extrapolations that Floyd Hospital has offered as the subject of judicial notice are subject to reasonable dispute.

The relevant geographic market is an essential part of a claim for attempted monopolization. *See Fishman v. Estate of Wirtz,* 807 F.2d 520, 531 (7th Cir. 1986). There are factual disputes regarding the territorial areas (and relevant product) that would meet the relevant geographic market for antitrust analysis. Floyd Hospital has defined the relevant geographic market as the six to nine counties that both home healthcare agencies operate in, then has used public records to support its factual contentions in showing Floyd Home Health's share of Medicare payments in its self-defined market. (Filing No. 31 at 7-8.) American alleges, in its Complaint, that the relevant geographic market is Floyd Hospital, which is located in Floyd County, Indiana. (Filing No. 1 at 5.) On a motion to dismiss, the court accepts as true all factual allegations in the complaint, thus judicial notice of data extrapolations that *conflict with the geographic market as defined in the Complaint*—Floyd Hospital—is inappropriate at this stage.

**B. Floyd Hospital's Motion for Judgment on the Pleadings (Filing No. 30)**

American filed this action alleging that Floyd Hospital's operation of its home healthcare agency constitutes attempted violation of the Sherman Act. Floyd Hospital, pursuant to Federal Rules of Civil Procedure 12(c) moves for judgment on the pleadings as to each of the claims asserted against them in the Complaint.

**1. Section 2 Sherman Act Claim**

Section 2 of the Sherman Act provides for an attempted monopolization claim where "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it...." *American Tobacco Co. v. United States*, 328 U.S. 781, 785 (1946).

> The proof requires (1) a specific intent to monopolize, *i.e.*, to gain the power to control prices or to exclude competition in a line of commerce. . ., (2) predatory or anticompetitive acts engaged in to further the purpose to monopolize, and (3) a dangerous probability of success in the relevant market which requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly.

*Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 269–70 (7th Cir. 1981) (citations omitted). American's attempted monopolization claim is based on two theories: 1) Floyd Home Health's market share of Floyd Hospital's home healthcare referrals and 2) the "essential facilities" doctrine.

**2. Relevant Market**

It is important to note the procedural posture of this case at the outset. On a Rule 12(c) motion, American is merely required to state a plausible claim for attempted monopolization. Thus, the relevant market for antitrust analysis, particularly in a case such as the one at hand where no discovery has commenced, survives a motion for judgment on the pleadings if it is plausible. (Filing No. 41 at 12.) An antitrust complaint survives a Rule 12(b)(6) motion unless the alleged

market suffers a fatal legal defect from the face of the complaint. *Newcal Indus., Inc. v. Ikon Office Sol.,* 513 F.3d 1038, 1045 (9th Cir. 2008). "And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) [or Rule 12 (c)] subject to factual testing by summary judgment or trial." *Id.* "Market power is 'normally inferred from the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography.'" *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir. 1987).

The Supreme Court defined the relevant product market for determining monopoly control of price and competition as products that are reasonably interchangeable by consumers for the same purposes. *U.S. v. E.I. du Pont de Nemours & Co.,* 351 U.S.377, 395 (1956). The reasonable interchangeability of products (or the cross-elasticity of consumer demand) defines the outer boundaries of said market; however, the Supreme Court has also acknowledged that well-defined sub-markets may exist within the broader market, that in themselves, constitute product markets for antitrust purposes. *Brown Shoe v. U.S.,* 370 U.S. 294, 325 (1962).

American contends that the relevant product market should be defined as home health services *following discharge from a* hospital as Medicare regulations provide for a distinct product by imposing unique requirements for discharge planning from a hospital. (Filing No. 41 at 16-17.) Floyd Hospital maintains that the product market is defined as home healthcare services, without regard for the referral source, as the Indiana statutory definition does not limit home health services to "services following hospital discharge." (*See* Filing No. 31 at 16-17 .) There are factual disputes as to the inferences to be made regarding home health services as defined by various public health regulations and the Court has previously noted that judicial notice is inappropriate under the circumstances of this case. Whether American plausibly alleges a distinct product

market is what matters at this stage. In any event, home health services following discharge from a hospital could legally be classified as a sub-market within the broader market of home health services from all referral sources.

Similar to the relevant product market, the relevant geographic market turns on factual issues. "The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 482 (1992). "As stated by the Tenth Circuit, the determination of the relevant geographic market turns on several factors, including "price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *McLaughlin Equip. Co. v. Servaas,* No. IP98-0127-C-T/K, 2004 WL 1629603, at *22 (S.D. Ind. Feb. 18, 2004).

American asserts that the relevant geographic market is Floyd Hospital because the hospital, through its discharging planning process, refers patients for home healthcare services. (Filing No. 41 at 18.) Floyd Hospital argues that American's geographic market is under-inclusive as there is no need for home healthcare customers to travel to receive benefits of service and courts are suspicious of plaintiffs limiting a relevant market to a single firm. (Filing No. 31 at 18.) Turning to the legal definition of a geographic market first, the United States Supreme Court has rejected the argument that a single firm can never be a relevant market. *Eastman at* 481. ("Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree."). Thus, American's alleged market does not suffer from the sort of fatal legal defect that would require dismissal of its Complaint. "This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market." *Id.* Indeed, the case cited by Floyd Hospital, with facts similar to the case at

hand, denied a motion to dismiss a home healthcare provider's claims against two hospitals.

*Delaware Health Care, Inc. v. MCD Holding Co.,* 893 F.Supp. 1279, 1290 (D. Del. 1995).

> Here, in its description of New Castle County and its population demographics, plaintiff may or may not have alleged accurate parameters of a relevant geographic market. Discovery may reveal that New Castle County is merely plaintiff's service area, as defendants contend. But given the idiosyncracies of the hospital and hospital-related markets as outlined above, the Court is not prepared to resolve these disputed factual issues on a motion to dismiss.

*Id.*

In *Elliot v. United Center*, the Seventh Circuit rejected a market definition based on a single firm, is distinguishable in significant ways. 126 F.3d 1003 (7th Cir. 1997). The plaintiff peanut vendors sought to sell peanuts in the United Center stadium, however, the stadium had a policy that prohibited all outside food from being brought into the venue. Critically, the court noted that no one argued that the United Center is in the market for peanuts or snack food, rather it was in the market for sporting and special events. *Id.* at 1005.

In contrast, American alleges that Floyd Hospital operates in the relevant market that it seeks access to by self-referring patients to its subsidiary Floyd Home Health. Another distinguishing fact is that *United Center* concerned the business/competition that takes place once inside a facility, while the case at hand concerns business/competition that takes place outside of the facility. *See id.* American has alleged that Floyd Hospital is the dominant acute care hospital in Southern Indiana, which the Court accepts as true, and is sufficient to establish a plausible geographic market. When viewed in a light most favorable to American, Floyd Hospital's exclusion of patients from competing home healthcare providers weighs in favor toward a dangerous probability of success that Floyd Home Health could achieve monopoly power in the home healthcare market.

### 3. __Market Power or Attempted Market Power and Anticompetitive Conduct__

"In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S. Ct. 884, 891, 122 L. Ed. 2d 247 (1993). While there is no established bright-line test in attempted monopolization cases, the Seventh Circuit has noted that many courts have found that a market share of 30%, by itself, is insufficient to prove a dangerous probability of monopolization. *Lektro-Vend Corp.,* 660 F.3d at 271. *Valley Liquors, Inc.,* provided a possible benchmark for courts to look to when the Seventh Circuit noted, "[i]n section 2 monopoly cases, a substantial percentage of the sales is usually at least 50%." *Valley Liquors, Inc.,* 822 F.2d at 666.

American's Complaint alleges that Floyd Hospital's self-referrals constituted no less than 64% of its discharges in 2015, and at least 70% currently. (Filing No. 41 at 24.) Accepting American's alleged plausible market definition, it has stated sufficient facts regarding Floyd Home Health's alleged market share percentage to sufficiently move past any possible benchmarks noted by the Seventh Circuit in attempted monopolization cases.

> The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

*Spectrum Sports, Inc.,* 506 U.S. at 458. The Medicare regulations provide for a regulatory structure that respects patients' freedom of choice in selecting providers. *See* 42 C.F.R. § 482.1. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 411 (2004). "One factor of particular importance is the existence of a regulatory structure designed to deter

and remedy anticompetitive harm." *Trinko* did not foreclose, as Floyd Hospital argues, that reliance on factual allegations that might violate a regulatory scheme could not also serve as the basis for an antitrust claim. *See id.* The Supreme Court acknowledged that a regulatory structure may be considered, but it does not end the question as the regulatory scheme must have regulations built into the scheme *that serve the antitrust function*. *See id.* at 412. The *Verizon* court went on to find that the Telecommunications Act of 1996 was enacted "*to eliminate the monopolies* enjoyed by the inheritors of AT&T's local franchises." *Id.* at 415. (Emphasis in original.)

American contends that the Medicare regulations do not serve an antitrust function, rather the rules were enacted to allow Medicare recipients the same opportunities to choose among available healthcare providers as are normally offered to the general population. (Filing No. 41 at 25.) *Trinko* establishes that a regulatory structure that is designed to deter and remedy anti-competitive harm is one factor that may be considered. Floyd Hospital has not shown how the Medicare regulations (that require hospitals to disclose alternative home healthcare providers) serves an antitrust function. American's allegation that Floyd Hospital has steered and disregarded patient choice (also a violation of Medicare rules) may also serve to satisfy the element of predatory or anti-competitive conduct in plausibly stating a claim under Section 2 of the Sherman Act.

### 4. <u>Essential Facilities</u>

American contends that Floyd Hospital is an "'essential facility,' to which it must have access in order to compete in the relevant product and geographic markets." (Filing No. 41 at 26.) Floyd Hospital responds that it is not plausible to allege that its facility "is the only essential healthcare facility in the Louisville metropolitan area, or even Southern Indiana, to which all home

healthcare agencies must have access to survive." (Filing No. 31 at 27.) This is an issue, which again, is related to the disputed relevant market.

Unavailability of access to the "essential facilities," is an indispensable requirement for invoking the doctrine. *Trinko,* 540 U.S. at 399. While the Supreme Court did not specifically recognize lower courts' creation of the essential facilities doctrine, it noted in *Trinko*, that it was simultaneously declining to recognize or repudiate it. *Id.* ("The Court's conclusion would not change even if it considered to be established law the "essential facilities" doctrine crafted by some lower courts."). The Seventh Circuit recognized four elements a plaintiff must prove "to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Flip Side Prods., Inc. v. Jam Prods., Ltd.,* 843 F.2d 1024, 1032 (7th Cir. 1988) (citation and quotation marks omitted).

Central to American's essential facilities argument is the Floyd Hospital's referral process. (*See* Filing No. 41 at 27.) American alleges that it is economically infeasible to require it to build and operate its own hospital in order to obtain home healthcare referrals. *Id.* At this stage, the Court accepts as true that Floyd Hospital, as the essential facility, controls the referral process by exclusionary conduct, and that American is unable to duplicate the essential facility, thereby denying access to competition.

Finally, Floyd Hospital asserts that monopoly leveraging is not a stand-alone theory of exclusionary conduct. (Filing No. 31 at 28.) Monopoly leveraging occurs where there is an alleged monopoly power in one market that the monopolist uses to leverage a monopoly in another related market. *See Delaware Health Inc.,* 957 F. Supp. at 539-40. "If there is no monopoly power

upstream, there can be no illegal leveraging of the downstream market." *Id.* at 540. In any event, American states that it is not pursuing monopoly leveraging as a stand-alone claim, rather the Complaint uses the word "leverage" exactly once in conveying the point that Floyd Hospital has leveraged its ability to self-refer patients into an unfair competitive advantage over other providers. (Filing No. 41 at 28.)

Based on the foregoing, American has alleged facts, which the Court accepts as true, in stating a plausible claim for attempted monopolization in violation of Section 2 of the Sherman Act. Accordingly, the Court **denies** Floyd Hospital's Motion for Judgment on the Pleadings. (Filing No. 30.) In light of this ruling and the Court's subject matter jurisdiction over the antitrust claim, the Court need not address Floyd Hospital's argument that the Court must dismiss the supplemental state law tortious interference claims. (Filing No. 31 at 29.)

### C. <u>Motion to Dismiss for Failure to State a Claim (Filing No. 38)</u>

Floyd Hospital filed a counterclaim based on a pre-litigation email sent by Dr. Buridi to certain physicians employed by the hospital. (Filing No. 29.) The counterclaim asserts that 1) American tortiously interfered with the physicians' employment contracts, 2) tortiously interfered with Floyd Hospital's business relationships, and 3) defamed Floyd Hospital. American filed a Motion to Dismiss the counterclaim, in its entirety, for failure to state a claim.

### 1. <u>Tortious Interference with Existing Contractual Relationships</u>

In order to recover for tortious interference with an existing contractual relationship, the plaintiff must show: "(1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *Melton v. Ousley,* 925 N.E.2d 430, 440 (Ind. Ct. App. 2010). For a

tortious interference with existing contractual relationship claim, Indiana law establishes that the contract must have been breached; however, termination of a contract is not the only way that the contract may be breached. "An employment contract can be breached short of terminating the employer-employee relationship." *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind. Ct. App. 2000). The inducement of the breach element of a claim may be satisfied "where a third party's conduct *substantially and materially impairs* the execution of an employment contract, frustrating an employee's expectations under her contract and making performance of her contractual duties more burdensome." *Id.* (emphasis added).

Where a claimant fails to allege that any contract has been breached on a tortious interference with contract claim, the claim must be dismissed for failure to state a claim as there is no basis for the claim without breach of the contract. *PNC Bank, Nat. Ass'n v. U.S. Army Corps of Engineers,* No. 2:13-CV-374-JVB-JEM, 2015 WL 880596, at *4 (N.D. Ind. Mar. 2, 2015). American contends that Floyd Hospital's counterclaim for tortious interference with existing contractual relationships must be dismissed because Floyd Hospital failed to allege that any of its physicians actually breached their employment contracts. (Filing No. 39 at 6.) In response, Floyd Hospital incorrectly cites the law on the third element—defendant's intentional inducement of breach—in making two flawed points: 1) breach of the contract is not a required element, and 2) Dr. Buridi's actions made it more burdensome for Floyd Hospital to perform its contract.

Taking the legal argument first, breach of a contract is a required element of a tortious interference with contract claim. The *Levee* case, cited by Floyd Hospital, did not depart from this principle; rather that case held that an employment contract can be breached in other ways short of termination of employment. *Levee,* 729 N.E.2d at 222. The *Levee* court held that an unfavorable salary increase that resulted from a third party's interference was a substantial and material

impairment to the execution of the contract satisfying the inducement of breach element. *Id.* Here, it is undisputed that Floyd Hospital's physicians did not terminate their employment contracts. (*See* Filing No. 44 at 6.) Taking as true, that Floyd Hospital spent time and effort to consult with physicians and respond to the false allegations, this fails to establish the sort of substantial and material impairment to the execution of a contract present in *Levee* or the other case cited by Floyd Hospital, *Eden United, Inc. v. Short,* 573 N.E.2d 920, 925 (Ind. Ct. App. 1991) (holding that a failure to perform could satisfy the breach of contract element). Floyd Hospital has not alleged that the physicians failed to perform in any way under their contracts, thus even under a broader definition of "breach", Floyd Hospital's counterclaim fails to establish intentional inducement of breach or a substantial and material impairment to the execution of the contract. As a matter of law, because breach (or alleged non-performance) is a necessary element of a tortious interference with existing contracts claim, this claim fails. American's Motion to Dismiss is **granted** as to this claim.

## 2. Tortious Interference with Business Relationships

The elements of a cause or action for tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Gov't Payment Serv., Inc. v. Ace Bail Bonds,* 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006). In addition to the five elements iterated, tortious interference with business relationships requires a showing that the defendant acted illegally in achieving his end. *Melton,* 925 N.E.2d 430, 436. "Illegal conduct is an essential element of a tortious interference with a business

relationship and defamation does not satisfy the illegality requirement." *Melton v. Ousley,* 925 N.E.2d 430, 436 (Ind. Ct. App. 2010).

American asserts that dismissal should be granted in its favor because there is an underlying contract that is more appropriately brought under a tortious interference with existing contract claim, and Floyd Hospital's counterclaim fails to establish illegal conduct. (Filing No. 47 at 5-6.) Floyd Hospital is correct that Indiana courts have recognized tortious interference with a business relationship claims in a few cases where there is also an underlying contract. Moreover, Floyd Hospital contends that the tortious interference with business relationships claim arises out of emails possibly sent by Dr. Buridi to non-employed physicians on its medical staff—different underlying relationships from the tortious interference with existing contracts claim altogether. (Filing No. 44 at 10.) However, it is also established that defamation does not satisfy the illegality requirement of this claim. *Id.* Therefore, Dr. Buridi's alleged defamatory email, as a matter of law, cannot serve as a basis in defeating American's Motion to Dismiss.

In its Response filed August 1, 2017, Floyd Hospital argued that it should be permitted one opportunity to attempt to amend its pleadings after it had an opportunity to conduct discovery and amend its Counterclaim if necessary. (Filing No. 44 at 12.) Accordingly, **dismissal of this claim is without prejudice** and the Court grants Floyd Hospital's alternative request for leave to amend this claim if through discovery, it has assessed any illegal action occurred in support of a tortious interference with business relationship claim.

### 3. <u>Defamation</u>

To maintain an action for defamation, a plaintiff must prove four elements: "(1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages." *Kelley v. Tanoos*, 865 N.E.2d 593, 596-97 (Ind. 2007). A communication is defamatory *per se* if

it imputes: "(1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Id*. at 596. The defamatory nature of a communication must appear without resort to extrinsic facts or circumstances. *Branham v. Celadon Trucking Servs., Inc.,* 744 N.E.2d 514, 522 (Ind. Ct. App. 2001).

A primary point of contention between the parties concerns whether or not Dr. Buridi's email satisfies the publication element. (Filing No. 47 at 8; Filing No. 44 at 13.) If there were no publication this would be a dispositive point. It is undisputed that the email in question was sent only to physicians employed by Floyd Hospital. (Filing No. 29 at 8 ¶ 6.) American essentially argues an agency theory, in that there is no publication in this case because Dr. Buridi sent the email to physicians that acted as Floyd Hospital's agents. (*See* Filing No. 39 at 8-9.) Floyd Hospital persuasively defeats this argument, in response, by stating that the recipients of the email were not authorized representatives or agents of the hospital in handling any dispute Dr. Buridi had about the referral practice. (Filing No. 44 at 19.)

American asserts an alternative reason for dismissal in that Dr. Buridi is a layperson and his comments regarding legal implications from Floyd Hospital's referral practice are based on opinions not susceptible to defamatory imputation. (Filing No. 39 at 10). Floyd Hospital points to at least two statements in the email which it argues were purported (defamatory) factual statements, rather than a laypersons (nonactionable) legal opinions. (Filing No. 44 at 14.)

> Floyd control[s] more th[a]n 80% of home health market they are trying to get us out of business by stealing our patients. Dumping poor [un]insured and distant complicated cases on us, and not giving us any consult.
> . . .
>
> [T]he dr. [i]s responsible for all his referral[s], as you are signing on the referral and care plan before they get paid. [I]n doing so you are violating federal Law of self referral to your employer and [a]ccepting salary and benefits in exchange (which put the corporation and employee both a risk of violating the federal law.

*Id.* (spelling corrections in original).  "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."  Restatement (Second) of Torts § 566.  The Court finds *Coastal Abstract Service, Inc., v. First American Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir. 1999) instructive for the proposition that "statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact."  However, as pointed out by Floyd Hospital, the email also contains statements that are purported facts, able to be proven true or false, unrelated to legal opinions.  Furthermore, communications that impute misconduct in a person's trade, profession, occupation, or office are defamatory *per se* where damages may be presumed. *Kelley at* 597. At this stage of the proceedings, the Court views the allegations in the counter complaint in a light favorable to Floyd Hospital, in its assertion that the email contained actionable defamatory factual statements, able to be proven true or false.  Accordingly, Floyd Hospital's counterclaim for defamation has survived the initial hurdle of a motion to dismiss and American's Motion is **denied**.

## IV.   CONCLUSION

For the reasons stated above, Defendant/Counterclaimant Floyd Hospital's Motion for Judgment on the Pleadings is **DENIED** ([Filing No. 30](#)).  Plaintiff/Counter Defendant American's Motion to Dismiss is **GRANTED** as to Count I of the Counterclaim, Tortious Interference with Existing Contractual Relations and Count II of the Counterclaim, Tortious Interference with Business Relationships.  The Motion to Dismiss is **DENIED** as to Count III of the Counterclaim, Defamation ([Filing No. 38](#)). The dismissal of Count II of the Counterclaim is without prejudice, as the Court **GRANTS** Floyd Hospital leave to amend Count II, Tortious Interference with Business Relationships ([Filing No. 29](#)).  The Amended Counterclaim, if any,  should be filed

within fourteen (14) days of the date of this Order. If no Amended Counterclaim is filed, the

claims remaining for trial are:

- Count I of the Complaint, Attempted Monopolization;
- Count II of the Complaint, Tortious Interference with Contractual Relations; and
- Count III of the Complaint, Tortious Interference with Prospective Business Relations;
- Count III of the Counter complaint, Defamation.

**SO ORDERED.**

Date: 3/5/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Casey L. Hinkle
KAPLAN & PARTNERS LLP
chinkle@kplouisville.com

David S. Kaplan
KAPLAN & PARTNERS LLP
dkaplan@kplouisville.com

James Edwin McGhee, III
KAPLAN & PARTNERS LLP
jmcghee@kplouisville.com

Chelsea R. Stanley
STITES & HARBISON, LLP
cstanley@stites.com

Douglas B. Bates
STITES & HARBISON, LLP
dbates@stites.com

Richard A. Vance
STITES & HARBISON, PLLC – Louisville
rvance@stites.com

Rodney Lee Scott
WATERS, TYLER, HOFMANN & SCOTT, LLC
rscott@wthslaw.com