## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

| | | |
|---|---|---|
| AMERICAN HOME HEALTHCARE SERVICES, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00089-TWP-DML |
| | ) | |
| FLOYD MEMORIAL HOSPITAL AND HEALTH SERVICES | ) ) | |
| a/k/a THE HEALTH AND HOSPITAL CORPORATION OF FLOYD COUNTY, BAPTIST HEALTHCARE SYSTEM, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| FLOYD MEMORIAL HOSPITAL AND HEALTH SERVICES, | ) ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HOME HEALTHCARE SERVICES, INC., | ) ) | |
| | ) | |
| Counter Defendant. | ) | |
| | ) | |
| HARRISON COUNTY HOSPITAL, | ) ) | |
| | ) | |
| Interested Party. | ) | |

### ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants

Floyd Memorial Hospital and Health Services ("Floyd Hospital") and Baptist Healthcare System,

Inc. ("Baptist") (collectively, the "Defendants"). (Filing No. 98.)  In this anti-trust case, Plaintiff

American Home Healthcare Services ("American") alleges the Defendants attempted to

monopolize home healthcare referral of patients discharged from its hospital and interfered with American's patient relationships regarding the patients' selection of a home healthcare agency. Defendants seek summary judgment, arguing American cannot establish a relevant market, show that Defendants will exercise market power, or show that Defendants engaged in anticompetitive conduct. For the following reasons, the Court **grants** Defendants' Motion for Summary Judgment.[1]

## I.      BACKGROUND

### A.      Motions to Limit and Exclude Expert Testimony

Before relaying the facts of this case, the Court must address what evidence it will consider. Both parties offer expert testimony, and both have filed motions to either limit or exclude the testimony of the opposing experts. (Filing No. 96; Filing No. 103.)

#### 1.      Defendants' Motion to Limit and Exclude Expert Testimony (Filing No. 96)

American has designated two expert witnesses: Fareed Bhutto ("Bhutto"), administrator and part-owner of American who will offer testimony as both a fact witness and an expert; and Elizabeth Bowersox ("Bowersox"), an expert in business valuation, who was retained by American's counsel to "provide a calculation of cash flow related to the economic damages claims" alleged in this matter.  (Filing No. 106-15 at 6.)  The subject of the expert testimony American seeks to offer is generally the amount of damage it believes it suffered as a result of Floyd Hospital's anticompetitive referral methods.  This amount breaks down into two numbers: (1) the

---

[1] American's Complaint also brought claims of Tortious Interference with Contractual Relations and Tortious Interference with Prospective Business Advantage, (Filing No. 1), but American has agreed to dismissal of those claims. (Filing No. 92.) Floyd Hospital filed a counter-claim alleging (1) Tortious Interference with Contractual Relations, (2) Tortious Interference with Business Relationships, and (3) Defamation. (Filing No. 29.) The Court granted American's Motion to Dismiss the first claim and dismissed the second claim without prejudice. (Filing No. 48.) Floyd Hospital has agreed to dismissal of its Defamation counter-claim. (Filing No. 92.) Thus, the only claim currently pending in this suit is American's claim for Attempted Monopolization.

number of patients American lost from Defendants' anticompetitive practices, and (2) the revenue American would have made caring for those patients.

The calculation of each of these numbers was made by Bhutto. In the memorandum supporting their motion, Defendants detail the methods Bhutto used and point out each instance where they believe he made a faulty assumption or relied on misleading data. Defendants argue that Bhutto should not be allowed to give expert testimony on this subject because it is not based on sufficient facts or data as required by Federal Rule of Evidence 702(b). They also assert that Bowersox should be excluded as a witness because she was directed to assume the numbers Bhutto calculated were correct, and thus her analysis is felled by the same faulty assumptions and misleading data. (Filing No. 97 at 22.)

Defendants' points are well-taken, and the Court shares their skepticism about the accuracy of Bhutto's calculations. However, the Court is able to understand the methods Bhutto used in making his calculations, and thus believes the Defendants' concerns go to the weight, rather than the admissibility, of American's expert testimony. For example, when calculating the number of patients American lost because of Defendants' referral practices, it compared Defendants to just one other hospital rather than considering all hospitals in the area. Bhutto acknowledged he chose to compare American's referrals from Floyd Hospital to its referrals from Clark Memorial Hospital "because [Clark Hospital doesn't] own a home health agency." (Filing No. 97-2 at 89.) His decision to assume that without its anticompetitive practices Floyd Hospital would refer the same percentage of patients to American as Clark Memorial Hospital rather than including in his analysis some of the other hospitals in the area that are affiliated with home health agencies relates to the weight the Court will give his testimony, rather than admissibility. The same rational applies to Bowersox's expert testimony. To the extent that it affirms what Bhutto reported, the Court will

consider the data and assumptions he used and determine the appropriate weight to give to Bowersox's testimony on that basis.  Defendants' Motion to Limit and Exclude Expert Testimony is **denied**.

2.   **American's Motion to Exclude Daniel Sullivan's Expert Opinions Concerning the Relevant Geographic Market (Filing No. 103)**

To resolve this case, the factfinder will be required to determine the relevant geographic market in question—an essential component of a successful claim under the Sherman Antitrust Act, 15 U.S.C. § 2 (the "Sherman Act"). To support its position on this issue, Defendants seek to admit the testimony of Daniel Sullivan ("Sullivan"), the president of a health care management consulting firm.  (Filing No. 99-7 at 4.)  American asks the Court to exclude Sullivan's testimony as to relevant geographic market, arguing that Sullivan is not an economist and that he does not employ reliable methodology. (Filing No. 104.)

First, the Court concludes that Sullivan's experience in the health care field qualifies him to give an opinion on health care markets—he need not be an economist to do so.  Second, the Court does not believe Sullivan is attempting to define the relevant geographic market for legal purposes, and to the extent he is the Court is able to disregard that testimony.  The Court surmises that testimony will merely offer his definition of American's geographic market for business purposes—he essentially lists the counties in which American operated.  Thus, his view about American's geographic market is not derived from Sherman Act caselaw, but from his own expertise observing healthcare markets. The Court will not substitute Sullivan's definition of a geographic market for the legal definition used by the Seventh Circuit.  Any inconsistency between the two definitions does not require exclusion of Sullivan's testimony, it merely requires the Court to incorporate any credible information Sullivan offers as an expert into the legal framework it will use in its analysis of the pending motion.  American has not convinced the Court that Sullivan's

report and testimony must be excluded under Federal Rule of Evidence 702, and thus the Court will not exclude it.  American's Motion is **denied**.  Having resolved those initial motions, the Court now moves to the facts and background of this case.

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to American as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B.**    **The Parties**

**1.**    **American Home Healthcare Services**

American was an independent provider of home health services based in Jeffersonville, Clark County, Indiana. American was licensed by the Indiana State Department of Health ("ISDH") and certified by the Centers for Medicare & Medicaid Services ("CMS"), the federal agency that administers Medicare.  (Filing No. 99-2 at 4, 10.)  American ceased doing business in early 2018. (Filing No. 99-4 at 6.) American was founded by Dr. Abdul Buridi, a prominent nephrologist with offices in both Indiana and Kentucky. (Filing No. 99-5 at 5-7.) Dr. Buridi was the president of American and initially owned 25% of the company.  *Id.*  His ownership share had increased to 75% by the time of American's closure. (Filing No. 99-2 at 4.)

**2.**    **The Defendants and Associated Parties**

Floyd Memorial Hospital and Health Services ("Floyd Hospital") was an acute care hospital located in New Albany, Indiana, that was operated by the Floyd County government for many years.  On October 1, 2016, Floyd Hospital was acquired by Baptist Healthcare System, Inc. ("Baptist"), another party to this suit.  (Filing No. 99-5 at 4.)  Baptist is a healthcare system consisting of multiple hospitals and other healthcare groups in Kentucky and Southern Indiana.

Dr. Daniel Eichenberger ("Dr. Eichenberger") was the president of Floyd Hospital and continued as president after the acquisition at the renamed Baptist Health Floyd Hospital.  *Id.*

Floyd Home Health was the ISDH-licensed home health agency wholly-owned by Floyd Hospital.  During American's existence, American was in competition with Floyd Home Health, which is not a party in this suit.  Floyd Home Health was transferred to Baptist as part of the 2016 acquisition, and was renamed Baptist Health Floyd Home Care ("Floyd Home Care").

**C.**   **Home Health Services**

 **1.**   **Overview**

Home health services provides skilled nursing care, physical therapy, continuing occupational therapy, speech-language pathology, home health aide services, and medical social services. Because home health agencies ("HHAs") are licensed by the state, and usually reimbursed by Medicare, their services are defined and regulated by the government.  It is typically less expensive to offer these services in the patient's home, avoiding the higher cost of hospital stays. Most patients seeking home health services are older, and many qualify for Medicare. Accordingly, Medicare payments generally account for a substantial portion of HHA revenue, and that was the case for both American and Floyd Home Care. (Filing No. 99-7 at 7-8 (expert report finding that Medicare payments accounted for 68% of revenues at both American and Floyd Home Care); Filing No. 99-2 at 13 (American's designee stating that 60-70% of revenues typically come from Medicare payments.))

Home health services are prescribed by a doctor, usually when a patient is discharged from a hospital, nursing facility, doctor's office, or clinic. (Filing No. 99-3 at 33.) Because home health care services are provided in the patient's home, the agencies a patient can patronize are limited to those that employ caretakers who are willing to travel to one's home. (Filing No. 99-7 at 13-14.)

2.      **Marketing**

Because patients are often referred for home care services by doctors upon discharge from a medical facility, home care providers generally market not directly to potential patients, but to those medical facilities discharging them. (Filing No. 99-5 at 34.)

American operated in nine Indiana counties—Clark, Floyd, Scott, Harrison, Crawford, Orange, Washington, Jefferson, and Jackson. (Filing No. 99-8 at 2-3.) In accordance with Medicare regulations, Bhutto, the administrator of American, wrote letters to all hospitals in the area requesting to be placed on their discharge disclosure list. (Filing No. 99-2 at 6-7; 42 C.F.R. 482.43(c) (requiring hospitals referring patients for HHA services to provide those patients with a list of HHAs and to include on that list any agency that requests inclusion.)) Floyd Hospital received Bhutto's letter and added American to its discharge list. (Filing No. 99-9 at 7.) American's officers testified that they sought patients from virtually every hospital in the nine counties in which they operated, some of which had affiliated HHAs and some of which did not. (Filing No. 99-5 at 27; Filing No. 99-3 at 10-16.) American also sought and received referrals from hospitals in Louisville. (Filing No. 99-3 at 10; Filing No. 99-11 at 5, 13; Filing No. 99-2 at 14.) It also marketed to and received referrals from skilled nursing facilities, rehabilitation hospitals, and doctor's clinics. (Filing No. 99-11 at 7; Filing No. 99-3 at 13-17, 38; Filing No. 99-5 at 34, 49; Filing No. 99-2 at 7.)

Floyd Home Care sought business in six Indiana counties—Clark, Floyd, Scott, Harrison, Crawford, and Washington—all of which American was also targeting for business. (Filing No. 99-9 at 8.)

### 3. __Competition__

A number of HHAs operated in Southern Indiana between 2013-2017. American listed the following eleven HHAs as its primary competitors: Floyd Home Care; 1st Care Home Health Services; Amedisys Home Health; At-Home Care of Harrison County Hospital; Best Choice Home Care; Carefirst Rehab LLC; Caretenders; Interim Healthcare of SE Indiana, Inc.; Kentucky One-VNA Health at Home; Kort-Rehab and Home; and Maxim Healthcare Services Inc. (Filing No. 99-12 at 3.) Floyd Hospital's discharge form listed 20 HHAs operating in the area, many of them were HHAs also listed by American as competitors. (Filing No. 99-9 at 8.) Nearby hospitals listed eight to ten HHAs on their discharge forms. (Filing No. 99-10 at 4; Filing No. 99-13 at 4-5.)

### 4. __Pricing__

The cost of home health services is often covered by Medicare. For American and Floyd Home Care, 68% of revenues are paid by Medicare. Under Medicare, providers are compensated by a fixed-fee-for-services – a set fee for each episode of care. While Medicare may pay less than private insurance for many health care services, the parties agree that Medicare pays more for home health services than other payors. (Filing No. 99-5 at 42; Filing No. 99-14 at 4.) The parties also agree that Medicare payments are set and not subject to negotiation by home health providers. Accordingly, the parties agree that HHAs do not compete on price with regard to Medicare patients. (Filing No. 99-2 at 21; Filing No. 99-14 at 7.) The parties agree that Medicaid payments are also non-negotiable but are less desirable than Medicare payments. Some home health patients have private insurance, but the parties agree that private insurance providers pay less for home health services than Medicare and that they are difficult to negotiate with. (Filing No. 99-2 at 12; Filing No. 99-7 at 10.)

### 5.   Quality

As with many healthcare services, it is difficult for patients to perceive a difference in quality between providers without first receiving treatment. To aide patients in deciding which HHA is best for them, CMS has established a star rating system on its website[2]. The purpose of the rating system is to assist consumers of home healthcare. The CMS ratings range from one to five stars, with five stars being the best an HHA can receive.  During the years 2014-17, American's CMS ratings were no better than 3.0-3.5 stars. (Filing No. 99-12 at 5.) During the years 2015-2018, the CMS ratings for Floyd Home Care were 4.0-4.5 stars, higher than the national and state averages. (Filing No. 99-7 at 28.)

## D.   Defendants' Referral Process

### 1.   Intake and Discharge

Upon being admitted to Floyd Hospital, each patient is initially evaluated by a discharge planner. (Filing No. 110-1 at 6.) Discharge planners are responsible for coordinating the patients' post-discharge care. (Filing No. 110-2 at 6.) If the discharge planner determines a patient may need services following discharge, that need is documented in a preliminary discharge plan. (Filing No. 110-1 at 6, 27.) Floyd Hospital's Care Coordination Supervisor testified that there is no "cookie cutter" way to determine when it may become apparent a patient will need home health services. (Filing No. 110-2 at 8.) In some instances, it may not be clear that a patient will need home health services until the day the patient leaves the hospital. *Id.*

Regardless of the discharge planner's initial evaluation, home health services can only be ordered by a physician. (Filing No. 110-1 at 8-9.) The physician may or may not review the discharge planner's initial evaluation. *Id.* at 14. The order for home care, including any

---

[2] The parties disagree about the accuracy and utility of these ratings.

recommended home health provider, is entered using Floyd Hospital's electronic charting system, known as Paragon. *Id.* at 36.

After an order for home care is entered, it is automatically faxed to the discharge planner. *Id.* at 12. After receiving the fax, the discharge planner communicates the need for home care to the patient in his or her room. *Id.* at 14. The patient then must select a home health agency to provide that care. (Filing No. 110-3 at 6-7.) It sometimes takes patients multiple days to select their preferred HHA, and in those instances hospital staff ask daily whether they have made their choice in order to prepare a discharge plan. (Filing No. 110-2 at 7.)

### 2.   **HHA Information**

More than half of the patients requiring home health services are elderly, and unfortunately, the younger patients needing such services are increasingly victims of the growing substance abuse epidemic. (Filing No. 110-1 at 7; Filing No. 110-2 at 12-13.) After home healthcare has been ordered, a case manager initiates a conversation with the patient about the nature of the services they need, communicates any recommendations from the physician, and provides a list of home healthcare providers. (Filing No. 110-1 at 15-16.) Defendants provide patients with a list of HHAs in the area. The list, which names Floyd Home Care at the top, provides names, addresses, telephone numbers, and the counties each HHA serves. (Filing No. 110-6; Filing No. 110-7.) If a patient expresses a desire for information the list does not provide, the Defendants direct the patient to the Medicare website or suggest that the patient  call the telephone numbers on the list. (Filing No. 110-1 at 18.)

Representatives of the HHAs generally do not speak to patients directly before they choose which HHA to use.  *Id.* at 22.  The first contact the HHA has with the patient occurs after the patient has selected which HHA to patronize.  *Id.* at 40.  Accordingly, the first opportunity an HHA

representative has to explain the nature of its services is after the referral has been made. ([Filing No. 110-8 at 10-11](#).) Despite having already selected an agency, patients are often completely familiar with the concept of home care or what an agency does. *Id.* at 11.

### 3. HHAs Lobby Hospital Employees, not Patients

Consistent with this discharge procedure, the parties agree that HHAs direct their marketing efforts at physicians and discharge planners—not the patients who will actually receive the services. At Floyd Hospital, HHA marketers "can meet with the physicians in their office or they can schedule a meeting with the hospitalist at the hospital." ([Filing No. 110-1 at 21](#).) As to case managers, marketers can attend an informal morning "meet and greet" or make a more formal presentation at a one hour "lunch and learn." *Id.*

These procedures hold true for Floyd Home Care. Floyd Home Care's director testified that Floyd Home Health's primary marketing agent "really talks to the providers, not the patients." ([Filing No. 110-8 at 7](#).) Floyd Home Care has also presented to Floyd Hospital case managers. *Id.* at 12-13. The evidence is clear that Floyd Home Care, and other HHAs, attracted patients through case managers who act as intermediaries and refer their patients. *Id.* at 10.

### 4. Bias toward Floyd Home Care

Floyd Hospital president Dr. Eichenberger described the way he views home health referrals as part of Baptist:

> [E]ach hospital has their own home health network, you know, primary service area. So our primary service area is, you know, depending on—if you look at a primary and secondary service area, seven counties typically. And depending on how far those counties are, we may or may not have home health services that go to all those primary service area counties. And each hospital is different in that regard.

([Filing No. 110-4 at 29](#).) In other words, there are eight hospitals under the Baptist umbrella, and each of those eight hospitals corresponds to a Baptist-owned HHA.

Floyd Hospital is the only hospital to which Floyd Home Care markets its services.[3]  *Id.* at

39.  Floyd Home Care staff market their services to Floyd Hospital case managers and physicians.

*Id.* at 30. The Floyd Home Care marketing staff have offices across the parking lot from Floyd

Hospital.   *Id.*   And a past referral coordinator for Floyd Home Care had an office inside the

hospital. ([Filing No. 110-8 at 5](#).) All newly hired hospitalists at Floyd Hospital receive an

orientation on the services offered by Floyd Home Care as part of their onboarding and training

process.  *Id.* at 8-9.

In the years 2013-2017, more than 80% of the patients Floyd Home Care obtained by

referral from a hospital were referred by Floyd Hospital. ([Filing No. 110-13](#).) Dr. Eichenberger

described the favorable referral process as a natural outgrowth of Floyd Hospital's confidence in

Floyd Home Care:

> [Y]ou have a known entity, you have good quality, you have good relationships, it
> all makes a difference. I mean, it's no different than me referring to, you know, a
> certain urologist or—you know, if I have a relationship with them and been with
> them for a long time. Even though there's 20 in the market, you know, there's 2 I
> refer to.

([Filing No. 110-4 at 38-39](#).)

Floyd Hospital uses a computer interface called Paragon, which provides users the option

to recommend a specific home healthcare agency when ordering home health services. ([Filing No.
110-1 at 10-11](#).) Paragon provides two boxes the user can check: "Baptist Home Health Floyd" or

"other."  *Id.* at 37-38.  Thus, when recommending an HHA, a doctor can either check the box for

Floyd Home Care or check the box for other and type in which specific HHA he or she

recommends.

---

[3] Floyd Home Care markets to other facilities—skilled nursing facilities, rehabilitation hospitals, and clinics. It just does not market to any other general hospitals.

Floyd Hospital employees routinely recommend Floyd Home Care. Dr. Eichenberger, who sees patients at his offices and at the hospital, testified that he checks the box for Floyd Home Care "nearly 100 percent" of the time. (Filing No. 110-4 at 43.) He explained his reasons for doing so:

> Well, for me personally, and I can go—my routine is, you know, on our discharge order set that we have in the computer, we have two choices; the first one is Baptist Home Health and home health other. And I cannot remember the last time I actually clicked the "other" box. I just routinely click Baptist Home Health.
>
> If the patient has a relationship with someone else, the Case Manager takes care of it and they go somewhere else. Really, I mean, that's fine. But if the patient doesn't have a choice, then I typically want to refer to my own entity. I know the folks and work with them well. And they come directly to my inbox, and I can sign the orders in the computer and it makes it easy.

*Id.* at 40. Dr. Eichenberger assumed that other physicians followed the same thought process. *Id.* at 40-41. Other Floyd Hospital staffers have agreed that it is routine for them to check the box for Floyd Home Care when recommending a home health agency. (Filing No. 110-14 at 6-7; Filing No. 110-3 at 8.)

Some evidence in the record suggests that Floyd Hospital's physicians are discouraged from recommending any HHA other than Floyd Home Care. Two of American's employees testified that Dr. Kazmi, a hospitalist at Floyd Hospital, had tried to recommend American but was instructed by a case manager that Floyd has its own home health company. (Filing No. 110-5 at 11; Filing No. 110-10 at 4-5.) A different employee of American testified that Dr. Waheed Ahmed reported that he had been told not to recommend any HHA other than Floyd Home Care. (Filing No. 110-15 at 3.) Dr. Kazmi testified at his deposition that he has the freedom to recommend whichever HHA he likes and Dr. Waheed Ahmed was not deposed. (Filing No. 110-12 at 6.)

There is also a dispute in the record about whether Floyd Hospital provides the HHA discharge list to patients in instances when a specific HHA has not been recommended by the physician. American has designated the affidavit of a redacted family member of a Floyd Hospital

patient.  The affiant states that when she was trying to arrange home care for her relative over the telephone, the Floyd Hospital representative suggested Floyd Home Care and did not offer any alternatives. (Filing No. 110-16 at 2.)  The affiant insisted that her relative receive care from American, and the patient ultimately did.  *Id.* at 4.  The affiant called Floyd Hospital to complain that she had not been offered any other choices, and the person she spoke to said that they had not offered the list of other HHAs because the conversation took place over the telephone.  *Id.* at 3. The affiant did not believe that rationale.  *Id.*

Medicare data shows that Floyd Hospital's referrals skew heavily in favor of Floyd Home Care:

| Year | Total Referrals | Referrals to Floyd Home Health | Percentage to Floyd Home Health |
|------|-----------------|-------------------------------|--------------------------------|
| 2013 | 865 | 594 | 68.7% |
| 2014 | 869 | 578 | 66.5% |
| 2015 | 914 | 585 | 64% |
| 2016 | 922 | 547 | 59.3% |
| 2017 | 1070 | 642 | 60% |
| All years | 4640 | 2946 | 63.5% |

(Filing No. 110-17.)  Defendants' internal data, which tracks all referrals, including patients who pay with Medicaid or private insurance, indicates Floyd Hospital referred just over 68% of all patients it referred for home care to Floyd Home Care in 2017 and 2018. (Filing No. 110-19.)

Dr. Eichenberger attributes these percentages to Floyd Home Care's "reputation and []brand recognition" and that Floyd Hospital employees "like to support the organization." (Filing No. 110-4 at 44.)  Dr. Eichenberger testified that "[m]ost referrals are about relationships.  So once

you feel comfortable with an agency … you, you know, typically are more loyal to referring to those folks." *Id.* at 31.

In contrast, American questions whether Floyd Home Care's brand is actually driving referrals, noting that Floyd Home Care sees far fewer referrals from nearby Clark Memorial Hospital, which is not affiliated with Baptist.  And American challenges whether quality plays a role in these referrals.  It cites evidence that Floyd Hospital patients often rely on physicians to explain the Medicare star ratings and quotes testimony from Floyd Hospital employees acknowledging that the star ratings fail to capture many variables that affect the quality of HHAs. (Filing No. 110-4 at 48-54.) Dr. Eichenberger concedes that most patients are unaware of the star ratings and a physician's recommendation plays a bigger role in their HHA selection.  *Id.* at 55-56.

## II.      LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  A disputed fact must be "material," which means that it might affect the outcome of the case under the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248.  Disputes over irrelevant or unnecessary facts do not preclude summary judgment. *Id.* A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

### III.   DISCUSSION

On June 17, 2020, Defendants filed a Motion for Leave to File Notice of Supplemental Authority re 98 Motion for Summary Judgment. (Filing No. 121).  That Motion is unopposed. (Filing No. 122).  The Motion, Filing No. 121, is **granted** and the supplemental authority will be considered by the Court. The authority Defendants ask the Court to consider is *Shah v. VHS San Antonio Partners LLC*, 2020 WL 1854969 (W.D. Tex. April 9, 2020), *appeal docketed*, No. 20-50394 (5th Cir. May 12, 2020). In *Shah*, a pediatric anesthesiologist sued Baptist, alleging its exclusive contract with one company to provide pediatric anesthesiology services in its San Antonio area hospitals violated the Sherman Act. The District Courted granted Baptist's Motion for Summary Judgment, determining that the plaintiff lacked an anti-trust injury and that he had failed to demonstrate a relevant market and failed to demonstrate harm to that market—the same grounds on which Baptist moves for summary judgment in this case.

16

Baptist argues *Shah* is factually similar to this case, but the Court disagrees. *Shah* is legally similar, as the plaintiff in *Shah* also made claims under the Sherman Act and Baptist asserted the same arguments it asserts here. But factual distinctions reduce the relevance of *Shah* to the case before the Court. First, in *Shah*, Baptist had an exclusive contract with the pediatric anesthesiology provider to provide services within its hospitals. The issue in this case is not services to be provided in Baptist's hospitals, but referrals made for services to be provided after discharge. And there is no allegation that Baptist has an exclusive arrangement to refer all patients in need of home care to Floyd Home Care—only an allegation of improper steering and a disproportionate number of referrals. Second, and more importantly, the relevant markets alleged in the two cases are different. Here, American alleges a relevant geographic market of Floyd Hospital itself—which Defendants contend is too narrow. The *Shah* Court rejected the plaintiff's asserted geographic market of "Bexar County and the seven contiguous counties" because it was ill-defined, self-serving, and "both under-and over-inclusive." *Shah*, 2020 WL 1854969 at *5-6. The asserted relevant geographic market in *Shah* was unclear because the plaintiff included "some pediatric hospitals in the San Antonio area that offer pediatric anesthesia services, but not all of them" and excluded "other non-hospital environments where pediatric anesthesia services are rendered." *Id.* at *5. Because plaintiff failed to offer any rationale for his arbitrarily defined geographic market, the Court rejected it. In this case, American could not be clearer about the relevant geographic market it asserts—Floyd Hospital itself—and the reasons it believes that is the appropriate market for the Court to consider. The question for the Court is whether the evidence in the record supports American's asserted market. The supplemental authority offered by Defendants is considered, but it is not especially useful for resolving this summary judgment motion.

In the single claim before the Court, American alleges that "[t]he Defendants have previously engaged, and continue to engage, in the described anti-competitive practices with the specific intent and design to build a monopoly and/or to exclude or destroy competition." (Filing No. 1 at 11.)  Under the Sherman Act, American seeks damages and injunctive relief in connection with Defendants' alleged attempt to monopolize the home healthcare industry in Southern Indiana. Section 2 of the Sherman Act imposes liability on "[e]very person who shall monopolize ... any part of the trade or commerce among the several states." 15 U.S.C. § 2. A private plaintiff such as American may bring a civil claim as a person who was "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).

"A firm violates the monopoly provision of Section 2 if it both (1) possesses 'monopoly power in the relevant market' *and* (2) engages in 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Viamedia v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (quoting *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).  Section 2 of the Sherman Act provides for an attempted monopolization claim where "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it…." *American Tobacco Co. v. United States*, 328 U.S. 781, 785 (1946).

> The proof requires (1) a specific intent to monopolize, *i.e.*, to gain the power to control prices or to exclude competition in a line of commerce…, (2) predatory or anticompetitive acts engaged in to further the purpose to monopolize, and (3) a dangerous probability of success in the relevant market which requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly.

*Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 269-70 (7th Cir. 1981) (citations omitted).

American's monopolization claim is based on one theory—Floyd Hospital engages in anticompetitive steering of patients to Floyd Home Care, which results in Floyd Home Care having an unusually large share of the market of Floyd Hospital referrals to the point where it can create a monopoly.[4]  Defendants assert four grounds for summary judgment: American has (1) failed to establish a relevant geographic market, (2) failed to show that there is a dangerous probability that Defendants will exercise market power, (3) failed to the show that Defendants engaged in anticompetitive conduct directed at monopolization, and (4) failed to demonstrate antitrust injury. (Filing No. 99.)

Attempted monopolization under the Sherman Act requires proof that the defendant possesses monopoly power in a relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  It is the plaintiff who has the burden of proving a dangerous probability of actual monopolization, and thus the plaintiff who must provide evidence of a relevant market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 (1993). A relevant market has two components: (1) the relevant **product** market, which identifies the products or services that compete with each other; and (2) the relevant **geographic** market, which identifies the geographic area within which competition in the relevant product market takes place. *Brown Shoe* at 324.  Without a definition of the relevant market, "there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equip. v. Food Mach. and Chem. Corp.*, 382 U.S. 172, 177 (1965).

There is no dispute as to the relevant product market—the parties agree that it can be defined as "home health services." (Filing No. 99 at 12-13; Filing No. 110 at 22-23.) The parties disagree as to the relevant geographic market. American asserts that the relevant geographic market is contained within the four walls of Floyd Memorial Hospital, where patients select which

---

[4] American initially asserted a theory of liability under the "essential facilities" doctrine but has abandoned that argument. (Filing No. 110 at 29.)

HHA they will patronize before they are discharged. (Filing No. 110 at 23.) Relying on the testimony of their expert, Defendants insist that the relevant geographic market is "limited only by the willingness of HHAs to incur the travel or administrative expense to provide home health services to patients in their particular residences." (Filing No. 99 at 15.) Simply stated, Defendants' definition of the relevant geographic market is the nine Southeastern Indiana counties in which American operated—Clark, Crawford, Floyd, Harrison, Jackson, Jefferson, Orange, Scott, and Washington. (Filing No. 99-7 at 18.)

The conflict between these two visions of the market can be explained by a relatively simple question. Is the geographic market, as Defendants argue, "the market area in which the seller operates?" (Filing No. 99 at 15 (citing *Double D Spotting Serv., Inc. v. Supervalu, Inc.*¸136 F.3d 554, 560 (8th Cir. 1998) (quotations omitted).) Or, as American contends, is the geographic market "the area where []customers would look to buy … a product?" (Filing No. 110 at 24-25 (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1027 (10th Cir. 2002).) If it is the former, the geographic market is clearly a half dozen or so counties in Southern Indiana where both American and Floyd Home Care operated. However, if the Court uses the latter definition, the geographic market would be the confines of Floyd Hospital, where patients often select a home health agency.

Caselaw in the Seventh Circuit (and the Supreme Court of the United States) appears to open the door to either of these possibilities by using each definition as a factor in a two-factor test. "Identifying a geographic market requires both 'careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Republic Tobacco Co. v. N. Atlantic Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). The market in which the seller operates

is clearly Southeastern Indiana. But the area in which the purchaser can practicably turn for supplies, American argues, is Floyd Hospital.

American repeats this contention—that Floyd Hospital is the only place in which a Floyd Hospital in-patient can find a supply of HHAs—many times in its briefing. "The factual record indicates that inpatients at Floyd Memorial Hospital have only one place to which they can practicably turn for supplies of home health services: Floyd Memorial Hospital." (Filing No. 110 at 25.) "It is not possible for a patient to obtain these services from any place other than the discharge planning process at Floyd Memorial Hospital." *Id.*[5] It is logical for American to rely on that premise, which is essential to its geographic market argument. If evidence were to show that an in-patient at Floyd Hospital could select a home health agency from outside the four walls, that would contradict American's theory that Floyd Hospital has a monopolistic power that it can exercise over its patients.

American's argument is unpersuasive for two reasons—one legal and one factual. First, legally, American has misunderstood the way the burden operates in this case. It is American's burden to show a relevant geographic market by providing evidence that patients cannot, or at least in practice do not, make HHA selections from outside of Floyd Hospital. If the record were void of evidence on the issue, that would mean American has failed to meet its burden, not that the Defendants had failed to disprove American's theory.

Second, the record is not void of evidence on this question. American has overlooked record evidence—evidence it designated itself—that shows HHA choices have been made for Floyd Hospital in-patients outside the four walls of Floyd Hospital. American attached to its

---

[5] Also, "The commercial reality is that the services are exclusively accessed—*and the purchasing decision made*—at Floyd Memorial Hospital." (Filing No. 110 at 26.) "From the perspective of the consumer selecting a provider, the die is cast at the hospital. From a practical standpoint, they cannot travel elsewhere to shop around before or after they leave the hospital. There is not a shred of evidence in the record to the contrary." *Id.*

response brief an anonymous affidavit of from the relative of a Floyd Hospital in-patient, in which

the relative affirmed:

> At the time of her discharge, I was contacted by phone by someone at Floyd Memorial Hospital who informed me that [the patient] had been referred for home healthcare services. This person asked me if I wanted [Floyd Home Care]. She did not offer me any other choices. I responded that I did not want [Floyd Home Care], and that I wanted American Home Healthcare for [the patient].... I am a retired nurse. I knew that Floyd Memorial Hospital was supposed to provide me with a list of home healthcare agencies besides their own agency, without me having to ask for it. So about three days later, I called Floyd Memorial Hospital to complain. I spoke to someone at Floyd Memorial Hospital using a speaker phone. My sister was also present on the call. When I complained, the response from the person on the other end of the phone was that I was not offered a list of choices because I had been contacted on the phone. I felt that this answer was not credible and was more in the nature of making up excuses after-the-fact.

(Filing No. 110-16.)   The affidavit reveals that the affiant's relative ultimately did receive care

from American rather than Floyd Home Care.  *Id.* at 4.  This evidence also demonstrates that Floyd

Hospital employees call the family members of patients to consult them about HHA referral, at

least in some circumstances.[6] This fact contradicts the many arguments American makes

throughout its briefing that the process of selecting a home health agency "inevitably unfolds at

the hospital itself within a compressed period of time" and that "the die is cast at the hospital."

(Filing No. 110 at 25-26.)  It also absolves the Court of the task of determining whether the relevant

geographic market is determined by the operating space of the supplier or the shopping space of

the consumer—the evidence indicates that in this case both spaces are Southeastern Indiana outside

the walls of Floyd Hospital.  Thus assuming, *arguendo,* that the relevant geographic market is the

place where the consumer can practically make his selection, the designated evidence shows that

place is not limited to Floyd Hospital, as American argues.  The decision of which HHA to

---

[6] American stated in its response brief that in this case the affiant was contacted because she had the patient's power of attorney, but it does not address the relevance of that fact, and the affidavit itself makes no mention of that fact at all. *Compare* Filing No. 110 at 13 *with* Filing No. 110-16.

patronize, in at least some cases, is made outside the hospital in the home of a patient's relative, who has the ability to shop around outside of Floyd Hospital and its environs.

For those reasons, the Court rejects American's argument that the relevant geographic market in this case is Floyd Hospital. The evidence does not support that assertion, rather, the evidence supports the Defendants' contention that the geographic market is nine counties in Southeastern Indiana where the HHAs involved in this suit operate. American has failed to establish a relevant geographic market, or, more precisely, has failed to establish its asserted relevant geographic market—the brick and mortar structure that houses Floyd Hospital.

The Court's determination on this issue not only negates an element of American's claim, but is detrimental to the other elements.  For example, American argues the Defendants created a dangerous probability of monopolization when Floyd Home Care received an average of 63.5% of Floyd Hospital's Medicare HHA referrals. (Filing No. 110 at 32.) However, when using the geographic market described by Defendants' expert, that number carries little importance.  Because Floyd Hospital only accounted for approximately 35% of discharges in that market, Floyd Home Care's share of those referrals from Floyd Hospital says little about its dominance in the market overall. When the market is expanded to Southeastern Indiana, Floyd Home Care—the largest among the home health providers in Southeastern Indiana—served only 21.3% of all home health patients in the market. (Filing No. 99-7 at 26-27.)  A twenty percent market share does not support a dangerous probability of monopolization.  *See Lektro-Vend Corp.* at 271 (noting that "numerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove a dangerous probability of monopolization.") (citing cases).

American has failed to establish its asserted relevant geographic market, an essential element of its Sherman Act claim.  Its arguments as to other elements of that claim were dependent

23

on the success of its geographic market argument.  Because American cannot establish elements of its claim, the Court finds that the Defendants are entitled to summary judgment.  The Defendants' Motion for Summary Judgment is therefore **granted**.

### IV.  <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** the Defendants' Motion for Summary Judgment.  (Filing No. 98.)  Defendants' Motion to Limit and Exclude Expert Testimony (Filing No. 96) is **DENIED**.  American's Motion to Exclude Daniel Sullivan's Expert Opinions Concerning the Relevant Geographic Market (Filing No. 103) is **DENIED.**  Defendants' unopposed Motion for Leave to File Notice of Supplemental Authority (Filing No. 121) is **GRANTED.**  This Order resolves all pending motions before the Court and all claims against all parties in this suit.  Final judgment will issue in a separate order.

**SO ORDERED**.

Date:  6/26/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Douglas B. Bates
STITES & HARBISON, LLP (Jeffersonville)
dbates@stites.com

Casey L. Hinkle
KAPLAN & PARTNERS LLP
chinkle@kaplanjohnsonlaw.com

David S. Kaplan
KAPLAN & PARTNERS LLP
dkaplan@kaplanjohnsonlaw.com

Christopher B. Rambicure
KAPLAN & PARTNERS LLP
crambicure@kplouisville.com

Rodney Lee Scott
WATERS, TYLER, HOFMANN & SCOTT, LLC
rscott@wthslaw.com

Chelsea R. Stanley
STITES & HARBISON, LLP (Jeffersonville)
cstanley@stites.com

Richard A. Vance
Stites & Harbison, PLLC – Louisville
rvance@stites.com

Katherine Kerns Vesely
O'BRYAN BROWN & TONER
veselyk@obtlaw.com